UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 16-81612-CIV-MARRA

MALIK LEIGH, ESQ.,

        Plaintiff,

vs.

ROBERT AVOSSA, CHERYL MCKEEVER,
CAMILLE COLEMAN, DIANNE WEINBAUM,
ELVIS EPPS, DAVID CHRISTIANSEN,
DARRON DAVIS, JOSEPH LEE (in their
individual and official capacities), PALM BEACH
COUNTY SCHOOL DISTRICT (BOARD),

        Defendants.

_____/

## OPINION AND ORDER

This cause is before the Court upon Defendants' Motion for Summary Judgment [DE

65].  The Motion is fully briefed and ripe for review.  The Court has carefully considered the

Motion and is otherwise fully advised in the premises.

## I. Background

The facts,[1] as culled from the evidence submitted in admissible form[2] in connection with

---

[1]Plaintiff has not complied fully with Rule 56 of the Federal Rules of Civil Procedure and Rule 56.1 of the Local Rules of Civil Procedure.  There is no outline of those material facts which Plaintiff considers to be uncontested. To the extent Plaintiff did not controvert Defendants' facts with evidence supported in the record, Defendants' facts are deemed admitted if they have record support. Where Plaintiff does not dispute a fact, but rather, only sets forth his opinion of the fact, the fact is deemed admitted. For example, Defendants' Statement, paragraph 7 states, "Immediately after the meeting, Area Superintendent, Camille Coleman came out of the School Board meeting and spoke with the students and their parents."  Plaintiff responds that he agrees in part, stating that Coleman came out to berate the students, and the Plaintiff had to intervene. Nothing in Plaintiff's response constitutes a denial of the fact that Coleman came out

the motion by all parties, and reasonably inferred therefrom in the light most favorable to

Plaintiff for the purpose of this motion, are as follows.[3]

and spoke to the students and their parents. Where Plaintiff agrees in part with a fact, but the sole basis for his partial denial is that there exists a different fact, which is not inconsistent with the first fact, the first fact is treated as admitted.  For example, in paragraph 32 of Defendants' statement, it says, "Leigh admits that he never had Principal McKeever's approval to hold the 'law camp' at Palm Beach Lakes High School." [DE 66]. Plaintiff responds by saying that he received verbal permission to begin marketing from Defendant Joseph Lee.  This is a good example of why the Court requires a separate statement of uncontested facts from the non-movant.  This is not a denial of Defendants' paragraph 32, rather, it is the statement of a separate fact, which, if it appeared in a discrete list, would then be addressed by Defendants in their reply. Defendants request the Court to disregard Plaintiff's exhibits, in part because he failed to set them forth in a separate document. [DE 71 at 1].  The Court declines to do that, noting that Defendants have responded thereto. [*Id.*].  The Court has evaluated Plaintiff's submission, and Defendants' response thereto, in the same manner it would have, had the evidence been presented in the proper format.  Although the Court does not condone the improper form, the Court prefers to address the submissions on the merits.

[2]Only evidence submitted in admissible form may be considered by the Court in connection with a motion for summary judgment. Any submissions not in admissible form have not been considered.  By way of example, newspaper articles produced as support for the facts contained therein constitute hearsay and cannot be relied upon for the truth of the matters asserted. Newspaper articles produced only to show that such articles existed are not hearsay and are admissible.  [DE 70 at 6 and 11].

[3]The Court has not taken into account "facts" that are beyond the facts and allegations set forth in the Complaint.  By way of example, in his Response in Opposition to Defendants' Motion for Summary Judgment, Plaintiff  argues that the Board and Defendant Avossa have a history of under funding "Black" schools. [DE 70 at 6].  Defendants have also included "facts" beyond the scope of the Complaint.  They list in their Statement of Undisputed Facts that "[t]hroughout this litigation, Leigh has continued a barrage of complaints and disparaging comments about the School Board, the individual Defendants, and others, in his social media accounts and on his law firm website, some of which warranted the entry of orders sanctioning him in this and related cases." [DE 66 at ¶65].  First, the Court does not view other cases that were brought by different plaintiffs against some or all of the Defendants in this lawsuit as "related" to this lawsuit.  Each lawsuit has been evaluated on its own merit, and this lawsuit shall be similarly reviewed.  Second, the Court shall review this case based upon the facts as they existed prior to the commencement of this case.  The Court does not view things that have arisen during this litigation as constituting material facts applicable to the instant motion.

2

Plaintiff, Malik Leigh, an attorney, began working as a teacher in the Legal Concepts and Comprehensive Law class (the "Law Academy") at Palm Beach Lakes High School in the fall of 2015. [DE 66-1 at 64].

Defendants note that early in the school year, a parent complained about a discussion of religion and references to the Bible during Plaintiff's class [*Id.* at 302-04]. At the time, Assistant Principal Villani discussed this with Plaintiff, who testified that

> Ms. Villani did what most people should do, she had asked me what exactly was it that you were talking about, what is it that you meant when you said what you said.
>
> And when I explained it to her, it made sense to her and she says, well, okay, just be careful because it's possible that somebody might take it completely different.
>
> And I said, okay. And if that is the case, I will make sure that I call the mother so that she knows . . .I did call the mom. Mom understood. We were good.

[*Id*. at 302-03].

In her testimony, Principal Cheryl McKeever testified that there was no formal verbal or written reprimand relating to this incident. [DE 66-2 at 251].

Defendants point to testimony given by Defendant McKeever regarding her having had a conversation with Plaintiff about him having students in his classroom during scheduled lunches. [DE 66 at ¶4]. Defendants characterize this as the Principal having "admonished" Plaintiff. [*Id*.]. No time frame is given for this discussion by Defendant McKeever in her testimony or by Defendants in their moving papers.

In her testimony, Defendant McKeever states that Plaintiff explained that he was mentoring those students. Defendant McKeever asked if he had permission to do that, noting that the students

were scheduled to be in lunch, not doing a mentoring session. Plaintiff said that he did not know that he needed permission to do that. [DE 66-2 at 243-44].  Defendants do not allege this incident resulted in any formal reprimand.

Plaintiff objects to Defendants' characterization of this event, and points to the testimony of Defendant Davis where he describes Plaintiff telling Defendants Davis and McKeever that he was mentoring students during their lunch breaks.  This occurred when Plaintiff met with them after the School Board meeting at the heart of this case. [DE 66-4 at 295-300].

During the course of the 2015-2016 school year, some of Plaintiff's students brought to his attention that they did not have a permanent teacher in their geometry class. Plaintiff described what the students relayed to him as follows:

> [T]hey talked about the fact that they didn't have a permanent teacher.  Their issue wasn't so much they didn't have the permanent teacher as they - - the subs that they were constantly getting wasn't teaching them anything, was using YouTube videos.  Just sat them in front - - I have never been in the class - - I guess they had computer screens in their class and they just - - when they came in, that teacher would then just go on-line and do a lesson search of some sort, find something, put it on and tell them to look at the video.

> Then for busy work, whatever notes that they took of whatever videos that they happened to watch, so that they could claim that they did work, he took the notes that they did on the lessons, even though they weren't teaching anything, and took them as work to be able to grade.

> The specific allegations, we had a couple of football players that the teacher had specifically told them that he would raise their grade to maintain - - so that they could maintain eligibility.  That that particular teacher or that sub, excuse me, that sub was giving - - was telling them to just do mundane work, draw pictures, just do stuff, move desks around and, you know, that's what they will record as a grade.

> Also, the teacher was accepting reams of paper and other, you know,
> classroom supplies for grades.
>
> Wanted him to, you know - - any students that - - not any, but at
> certain times if - - hit the students up for doughnuts because in that
> hallway or somewhere near that hallway there's some teachers that
> sell stuff during the course of the day . . . like the old cheerleading
> teacher, she used to sell stuff, but she's no longer doing it because
> she's no longer there.
>
> But so he would ask for like doughnuts and honey buns, stuff like
> that.  So that was an issue.
>
> None of the kids were learning anything.  They all failed their mid-
> term, but they all seemed to have a B in the class because of the
> mundane busy work.
>
> And so the main, main thing was by the time that they showed up on
> March the 16th, their EOC, their end-of-course exam, was going to be
> about a month away, which should be - - which should encompass
> the entire course.  And they hadn't learned anything and they were
> worried about failing it because it's an AICE course and they wanted
> to get their college credit.
>
> And so that was the issue.

[DE 66-1 at 107-109].

Five students attended the March 16, 2016 School Board meeting to bring this issue to the

Board's attention.  Plaintiff testified at his deposition that he went to the meeting to watch and

support his students. [*Id.* at 103-104].  He said that he was there as a private citizen. [*Id.* at 103].

Plaintiff transported one of the students to the meeting at the request of the student's parent. [*Id.* at

105-06].

Plaintiff testified that all of the students wanted to speak at the Board meeting, but they

signed in too late and were precluded from doing so. [*Id.* at 104].  The students were told to

5

designate one of them to speak. [*Id.* at 104-05].  The woman who advised them that only one student

could speak told Plaintiff, "since you're his teacher, you go ahead and go up there and speak - - or

you go ahead and go up there with him and if you want to say something, then feel free." [*Id.* at 112-

13].  Plaintiff said okay. [*Id.* at 113]. When asked at his deposition if he spoke at the meeting,

Plaintiff responded: "I didn't - - verbally, no." [*Id.*].  Plaintiff confirmed that the students did not

express any claims of racial discrimination at the School Board meeting. [DE 66-1 at 113].

   Plaintiff's description of the students' complaints and what occurred at the Board meeting

were confirmed by the Declaration of Joseph Trahan, who was the student who spoke at the Board

meeting. [DE 70-6].  Other than denying Plaintiff's self-characterization of himself at the meeting as

a "private citizen," Defendants do not dispute Plaintiff's recounting of what occurred before and

during the meeting.

   Immediately after the meeting, Area Superintendent Camille Coleman came out of the

School Board meeting and spoke with the students and their parents. [DE 66-1 at 113-14]. Plaintiff

testified that Ms. Coleman said that she was aware that the students did not have a teacher. [*Id.* at

114].  She suggested that the students take a course in the summer and push back the test date. [*Id.* at

115].  The students and one parent objected, noting that this unfairly punished the kids and would

take away their summer. [*Id.*].  She responded what do you expect me to do? [*Id.*].  The Declaration

of Joseph Trahan confirms Plaintiff's testimony of what occurred during that encounter. [DE 70-6].

   As with much of what occurred after the School Board meeting, the Parties cast the events in

different lights.  Defendants note that: "By Leigh's own testimony, Coleman was 'bringing up

options,' as to how to assist the students with the absence of a permanent teacher and their upcoming

end-of-course examination." [DE 66 at 2, ¶8].  Defendants thus paint a picture of a caring

administrator.

Plaintiff (and Joseph Trahan) describe the encounter differently.  Plaintiff describes Coleman as becoming defensive. [*Id.* at 115].  He notes that the kids "completely withdrew because they were looking at her as if - - they were realizing that she was talking at and down to them." [*Id.* at 116]. Trahan described Coleman's voice and behavior towards the students as "very loud and aggressive; so much so that Mr. Leigh got in-between her and us." [DE 70-6 at ¶23].

Defendants note that Principal McKeever held a meeting with the students and parents "to discuss how to move forward in a positive manner." [DE 66 at ¶9, citing to DE 66-2 at 294-96]]. Trahan's Declaration states that McKeever blamed the students for not having a teacher and told the parents that the students had run the teachers off. [DE 70-6 at ¶30].

An investigation was commenced into the students' complaints at the Board meeting (about the actions of the substitute teacher) the day after the Board meeting.  Darron Davis and Elvis Epps, Managers from the Office of Professional Standards, were the assigned investigators. [DE 66 at ¶11]. Trahan's Declaration states that the man who interviewed him "was not interested in what we discussed with the school board, he only wanted to know about Mr. Leigh." [DE 70-6 at ¶ 26].  An extensive exhibit submitted by Plaintiff contains Mr. Davis' report on his investigation into the substitute teacher, with ten student statements relating to the substitute and a statement from the substitute teacher. [DE 70-20].[4]

Mr. Davis also had been asked by Camille Coleman to look into Mr. Leigh and whether the

---

[4]Plaintiff submitted this Exhibit in support of his contention that despite evidence that what the students said was legitimate, Mr. Davis' and Dr. Epps' reports determined that the statements of the students about the substitute were untruthful. [DE 70 at 7].  The Exhibit, however, provides undisputed evidence that an investigation was, in fact, conducted into the issue raised by the students at the School Board meeting.

appearance of the students at the Board meeting was an authorized field trip as part of the Law

Academy. [DE 66-4 at 287-88]. Mr. Davis testified that his questioning of Mr. Leigh on this subject

matter was not disciplinary. [*Id*. at 395]. "[H]e wasn't the subject of any investigation. . . . It was just

an issue of concern." [*Id*. at 396]. He stated that "it was just more of a verbal conversation that we

had regarding just ensuring the safety of the students." [*Id*. at 396]. Mr. Davis testified that this was

no longer an issue once he established that this was not a field trip. [*Id*. at 290, 396].  Plaintiff

characterizes Ms. Coleman's request as "a pretext for a violation in the form of an unauthorized

'field-trip' allegation/investigation." [DE 69 at ¶12].

Defendants note that no formal disciplinary action was taken against Plaintiff relative thereto.

[DE 66 at ¶16].   Principal McKeever, however, did discuss the issue with Plaintiff and reminded

him about proper field trip procedures.  She pointed out to Plaintiff that District policy does not

allow verbal permission from a parent for a teacher to transport a student. [DE 66-2 at 203].  In his

responding papers, Plaintiff characterizes this meeting as a form of disciplinary action. [DE 69 at

¶16].  In his deposition, however, he said that he "wasn't presented with any kind of discipline." [DE

66-1 at 143]. "That conversation in that conference felt as if it were some kind of verbal warning . . .

." [*Id*.].  He testified that neither Principal McKeever or Mr. Davis told him that he was under any

type of investigation. [*Id*. at 144].

Cheryl McKeever testified that she told Plaintiff that out of respect for protocol, the issue that

the students brought to the School Board should have been addressed with her as the building

principal. [DE 66-2 at 204-05]. She testified, "I was understanding from both of us that as we

proceed forward, that we were on the same accord with you allowing to continue to teach our

children about the law, but also teaching them how to use it in a manner that is, that's in proper

accordance and direction." [*Id.* at 206]. Plaintiff also testified that the Principal "was upset that I hadn't come to her first and she didn't know anything about it, and, you know, that's a sign of disloyalty to her." [DE 66-1 at 136].

Darron Davis met with Plaintiff when he was at the school to conduct interviews. When Assistant Principal Villani brought to Mr. Davis' attention that Plaintiff had voiced some concerns about the student interviews, Mr. Davis offered to meet with Plaintiff. He met with Plaintiff and a student. Plaintiff voiced his concern about the students being investigated without parental permission. Mr. Davis explained to Plaintiff why that is done. [DE 66-4 at 296-98].

Two of the students who Mr. Davis sought to interview said that they had retained the services of the Malik Leigh law firm. [DE 66-4 at 316]. Although Plaintiff claims that he never personally represented the students, he acknowledges that his law firm, and law partner, did [DE 66-1 at 140-43]. Plaintiff told some of the students to call their parents and tell them about the interviews. He told one parent that she might want to come to the school. [DE 66-1 at 132-33].

On March 18, 2016, Leigh wrote an email to Superintendent Avossa complaining about how he believed Ms. Coleman and Principal McKeever were handling the issue raised by the students.[5] In its entirety the email reads:

> Good Morning Sir,
>
> First, I would like to say that it was great getting to speak with you last week at your task force meeting. But, in light of the issues involved with my students and their Geometry class, I would like to tell you that there is a high degree of intimidation by the Head Principal, Dr. McKeever.

---

[5]Phillip Stillman, Esq., a colleague of Plaintiff's in the Law Academy, set forth in his affidavit that he also sent an email to Dr. Avossa alleging that the students were being harassed. [DE 70-2 at ¶14].

> Yesterday in 7th Period, she summoned the kids into the auditorium and berated them about this issue. She also make [sic] the allegation that the kids do not have a teacher because they "ran him off," implying that their issue was one of their making.
>
> We met and conversed a little bit during our round-table "break out" session. Though I hinted at some of the issues, and even brought some up, I was unable to fully inform you of the major issues.
>
> As I told you last week, I'm 7 months into my rookie season as a teacher and the kids in my classes are "MY" kids. As a practicing attorney who advocates for children as my legal specialty, I absolutely will not sit back and tolerate blatant harassment and intimidation, and victim blaming by anyone. Both Dr. McKeever AND area superintendent, Coleman (I believe was her name) have both attempted this. In fact, Ms. Coleman showed a level of disrespect that is unbecoming her position to the kids' faces. If we all need to have a parlay to discuss that, I am MORE than willing to do so.
>
> But the immediate issue is the one that took place yesterday. I ask that you return the kids to their normal comfortable position at this school.

[DE 66-6].

Leigh's complaints were investigated by Dr. Epps, who interviewed the employees and a number of students and concluded that there was insufficient evidence of an ongoing pattern of harassment or intimidation.[6]  [DE 66-5 at 77, 91-92, 192].

In an undated letter signed by Plaintiff's law partner, Danielle Watson, stamped received by the Office of the Superintendent on March 29, 2016, Dr. Avossa, the Palm Beach County School Board, and Cheryl McKeever were placed on notice pursuant to Fla. Stat. §768.28 that "Watson Leigh" (Plaintiff's law firm) represented five students in the Geometry class relative to the lack of a certified teacher and how the students were treated after their attendance at the School Board

---

[6]Dr. Epps's conclusion is not binding upon this Court. It is referenced solely as evidence of what he concluded.

meeting.  The letter ends by stating:

> We believe that each individual claimant's claim for compensation is worth at least $300,000, and we are confident a jury, upon hearing the facts and admissions by Dr. McKeever and various witnesses, will find that both the School District, its supervisory employees, and Dr. McKeever were deliberately indifferent to the needs of the children at issue; derelict in their duties owed to these children and their parents; and negligent in the manner in which they performed their jobs which has caused permanent injury to the children, their parents, and their reputations.

[DE 66-7 at 1-3].[7]

On April 8, 2016, the Director of Professional Standards, Defendant Dianna Weinbaum, sent the following correspondence to Plaintiff:

> On March 16, 2016, five (5) Palm Beach Lakes High School students attended the Palm Beach County School Board meeting to raise concerns with the Pre-AICE classes at their school and the substitutes assigned to teach the course.  You were present at this meeting with the students, all of whom are currently in your Legal concepts and Comprehensive Law class at Palm Beach Lakes High School.  The District takes these allegations seriously and is conducting an investigation into the matters raised by the students.

> On March 17, 2016, HR Manager Darron Davis, from the Office of Professional Standards, went to Palm Beach Lakes High School to begin an investigation into the specific allegation raised at the Board meeting.  At least one of the students interviewed asked that you be present for the interview or at a minimum, review his written statement.  This student referred to you as "his attorney."

> Because these issues have been openly discussed in your Legal Concepts and Comprehensive Law classes, you are a witness in this

---

[7]A letter dated May 9, 2016 added another student to the list of students being represented. [DE 66-7 at 4].  There is also an undated letter placing these parties on notice pursuant to Fla. Stat. §768.28 regarding incidents unrelated to the Geometry students that occurred in April of 2016. [DE 66-7 at 5-8].

11

open investigation.  It is, therefore, essential that you do not interfere
with the investigation in any way or unduly taint the investigative
process.  As an attorney, you should know that class, group or
individual discussions with students about the subject matter of an
open investigation, such as what was said or asked in an interview,
could compromise the integrity, confidentiality and possibly taint the
investigation.  Furthermore, it is not appropriate for this on-going
matter to be part of any academic lesson at this point.

Accordingly, you should not be engaging in any conduct that could
improperly influence students while the investigation is pending.

Should you have any questions, please contact the Office of
Professional Standards at (561) 434-8873.  Thank you for your
cooperation in this matter.

[DE 66-8].

On April 12, 2016,[8] Plaintiff sent Dr. Avossa and the Palm Beach County School Board a

letter styled as a request for protection and disclosure under Fla. Stat. §112.3187, Florida's

Whistleblower Statute. [DE 66-9]. The letter states that "[t]he purpose for my request for protection

is directly related to the retaliation and plans for future retaliation against me for accompanying my

law students to the district board meeting on March 15, 2016."

Although the beginning of the letter recounts Plaintiff's rendition of what occurred to him

during and subsequent to that meeting, the letter goes on to relay Plaintiff's objections to how the

students were being treated relative to the issue raised at the meeting. A third of the letter contains a

somewhat rambling litany of vague allegations unrelated to the stated purpose of the letter, including

Plaintiff claiming to "have been privy to" and "having seen evidence of" direct demands for grade

---

[8]Although this letter is undated, Plaintiff's brief identifies it as having been sent on April
12. [DE 70 at 18].  His Complaint states that it was delivered on or about this date. [DE 1 at ¶8].

changes by the principal's "staff"; recounting without any names or details,  instances of students

having been beaten up by other students; his having been threatened by a student; claiming that a

former employee was fired for trying to protect special needs students; his witnessing of

"questionable yelling and cursing at special needs children", although "not aware if it constituted

abuse;" his having witnessed a teacher acting "aggressively unprofessional to a barely verbal child in

a wheelchair," and his having "created a safe zone for this child to come in my room if he ever needs

to get away." [*Id*.].

  The letter continues that he hopes it reaches the correct persons, "those at least that are able

to put the issue of children first and not their Delta Sorority affiliation."  It concludes by asking the

addressees to take an active "role in putting an end to this abuse of power, intimidation, and

harassment by Dr. McKeever, her staff, Darron Davis, and Area 4 Superintendent Camille Coleman.

Your actions could possibly save lives as children are getting hurt here." [*Id*.].

  Defendants have produced e-mails and letters documenting the efforts that were made by the

Inspector General's office to investigate Plaintiff's April 12, 2016 letter. [DE 66-10, DE 66-11].

Plaintiff accuses Defendants of having fabricated or altered part of their exhibit, and further claims

that he never received any letters until after he was terminated. [DE 69 at ¶¶ 26-28].

  Plaintiff concedes that he received an email from Joni Loehrig on April 19, 2016, requesting

that he contact her regarding his correspondence. [*Id*. at ¶28].  He also acknowledges having had a

phone conversation with her on April 21, 2016 [*Id*.], but denies having received the letter dated April

21, 2016, which stated that if Plaintiff wishes to pursue his complaint, he should contact Ms.

Loehrig. [DE 66-11 at 2].  As to the call from Ms. Loehrig, Plaintiff later wrote on June 3, 2016 to

Lung Chiu that he did not take the call seriously "because she only wanted to determine whether I

was a suitable whistleblower 'candidate' and not the merits of my disclosures." [DE 66-11 at 5]. In this letter, Plaintiff claims that his whistleblower complaints have already been dismissed; so, he does not know why he is being contacted.  Plaintiff states that the matter will be dealt with in various courts and agencies. [*Id.*].

After this June 3 letter was sent by Plaintiff, two letters dated June 3 and June 7, respectively, were sent by the Inspector General to Plaintiff advising that based upon his June 3 letter, they would not be taking any further action. Plaintiff was advised that if he changed his mind and wanted to pursue his complaint, he should contact them to schedule a meeting. [DE 66-11 at 6-7].  By letter dated June 9, 2017, Plaintiff accused the Inspector General of having done nothing.  Plaintiff denied having received the letters requesting information from him and accused the Inspector General of "attempting to use that as a way to say that I was not cooperating or was not requesting action." Plaintiff noted again that these matters would be addressed in his court actions and before various agencies. [DE 66-11 at 8].

Plaintiff notes that on May 2, 2016, the Defendants posted an opening for his position for the 2016-17 school year. [DE 69 at ¶40, DE 70-3].[9]

On May 3, Dianna Weinbaum sent Plaintiff a Memorandum advising him that it had been brought to her attention that recent behavior of his had violated one or more School Board policies. [DE 66-12].  She noted that comments he made on his website about the school principal and other

---

[9]Defendants state that there were budgetary concerns that led to the elimination of Leigh's position. [DE 66 at ¶42]; however, the Exhibits to which Defendants refer in this paragraph provide no evidentiary support for this contention.  Plaintiff did concede in his deposition that after the position was posted, the posting was removed. He further testified that his position was not filled at the start of the school year after his termination.  He testified that his class was combined with other classes, but the class eventually was split back up again, with substitutes covering his former class. [DE 66-1 at 237-38].

District personnel were not consistent with the expectations of the Professional Code of Conduct for educators. She also objected to Plaintiff having posted a video clip of his students on his law firm's website, which she noted violated various District policies.[10]  Finally, she referenced Danielle Watson's letter referrenced above, which advised the District that Plaintiff's law firm would be suing the District. She noted concern about the conflict of interest raised by his firm's representation of students currently enrolled in his classes. She pointed to policies that prohibit the exploitation of a relationship with a student for personal gain or advantage.

The Memorandum directed Plaintiff to treat all School District personnel in a respectful and professional manner; remove any images of students from social media postings unless he had the permission of their parents and consent from the school administration; and remember that it is not appropriate for him to use his position as a teacher for any purpose that would provide him a personal benefit. [*Id.*].

Plaintiff responded to Ms. Weinbaum's Memorandum by letter dated May 3, 2016 [DE 66-13, DE 98].[11]  Plaintiff denied Ms. Weinbaum's allegations relating to the Law Camp and asserted his belief that this allegation was being used to create a reason for terminating him. [DE 66-13 at 2]. He pointed out that he had been given permission by Tera Hands to post the videos on his website.

---

[10]Tera Hands, Plaintiff's immediate supervisor, affirmed that she gave Plaintiff permission to post the videos online. She states that in the Law Academy, the students sign a form that allows them to be videotaped. Provided the video was used to promote the Law Academy, she said this was acceptable. [DE 70-1 at ¶21].

[11]Defendants' Exhibit at DE 66-13 obviously was missing a page. Upon the Court contacting the Parties to correct this apparent photocopying error, the Court was advised that Defendants did not have the missing page. [DE 99]. Plaintiff's counsel produced the entire letter, containing Defendants' Bates Stamp on it, demonstrating that Defendants did receive the entire letter. The Court filed the entire letter, which was docketed at DE 98 . The Court has relied herein upon the complete version of the letter.

He stated that he had walled himself off from his firm's representation of the students; that

the students had given informed consent relative to any potential conflict of interest; and, under these

circumstances, the Florida Bar did not object to the representation. [DE 98].

Plaintiff accused Cheryl McKeever of purposeful harassment of students and faculty; the

creation of a hostile work environment for staff, resulting in the poor delivery of education for the

students; blatant discrimination; and placing special needs children in danger. He accused Darron

Davis of having "engaged in a determined campaign of harassment, intimidation, and retaliation of

the unrepresented students" who attended the School Board meeting. [*Id*.].

Plaintiff denied that he had violated any policies.  He stated that he had, however, "been

witness to the emotional, physical, and detrimental hazards [sic] of students, staff, and visitors at this

school." [DE 66-13 at 3]. He asserted that he would be filing a lawsuit on behalf of himself and other

teachers.  He demanded that the District stop attempts to smear, discredit, demote or defame him;

remove marks on his name from the District's computer system; return a fee for a sunshine law

request that went unfulfilled; and have Cheryl McKeever cease all retaliatory conduct. [*Id*.].

On May 12, 2016, Principal McKeever notified Plaintiff that she would not be

recommending that he be reappointed for the following school year. [DE 66-14].

The Watson Leigh law firm, by undated letter received by the Office of the Superintendent

on May 13, 2016, delivered a formal notice of Plaintiff's intent to sue the School Board,

Superintendent Avossa and Cheryl McKeever and others on behalf of himself and others similarly

situated. [DE 66-16].  This notice expresses that each individual claimant's case is worth "at least

$1,000,000 dollars." [*Id*. at p. 2].

On May 17, 2016, Plaintiff filed a complaint against the Palm Beach County School District

16

with the United States Department of Justice, Education Department requesting that the Department

of Justice investigate what was transpiring at the school. [DE 70-27 at 5-7].  The May 17 letter was

updated on May 25, 2016. [*Id*. at 1-4].  The United States Department of Education, Office for Civil

Rights, by letter dated July 22, 2016, advised Plaintiff that it had received his complaint alleging

discrimination on the basis of race and retaliation on May 30, 2016. [DE 70-14]. The letter states that

the District has been informed of the prohibition against retaliation. [*Id*. at 2].

There is no evidence before the Court as to when the District saw the May 17 and May 25

letters.  Plaintiff mentions having filed a complaint with the Department of Justice in his letter to Ms.

Weinbaum and Mr. Christiansen dated May 24, 2016 [DE 66-22 at 2], but there is no evidence

before the Court that the District had seen the complaint at that time.  Furthermore, there is no

evidence before the Court establishing when the District received the notification from the

Department.

On May 18, 2016, a letter from Dianna Weinbaum was hand-delivered to Plaintiff advising

him that an administrative investigation of him had been commenced by the Office of Professional

Standards into alleged ethical misconduct and/or the failure to follow policies, rules, directives and

approved curriculum. [DE 66-18].  At the same time, Plaintiff was given a letter from Principal

McKeever dated May 17, 2016, advising him that it had come to the administration's attention that

he had developed proposed final exams which contained inappropriate material.  He was directed not

to use the materials. [DE 66-17 at 1, DE 69 at ¶44].

One question on the proposed exam was:

"If a [sic] Donald Trump becomes president [sic] of the United states [sic], we are:
  A.  Screwed
  B.  Screwed

       C.      Screwed

       D.      Screwed behind a really YUGE wall that Mexico pays for."

[DE 66-17 at 9]. The Parties direct considerable focus to this question, including its origin and whether it could offend people; however, other questions on the exam are noteworthy.

Keeping in mind that these exams were for Law Academy classes, they contained many questions with no obvious connection to the courses. By way of example, there is a True/False question asking whether "Education Rationing is worse than an Apartheid School;" a question asking the students to "Name the School that sparked the Black Panther Movement;" a question asking in which Palm Beach Town Corey Jones was shot; a question asking "Which demographic represents the largest percentage drop in reading level between 3rd grade and 10 grade;" a question asking what hip hop group Phife Dog was in. [*Id*. at 3]. One multiple choice question reads:

"Mass incarceration occurs when a society:
    A. Imprisons many more citizens for obscure crimes, usually for the benefit of the
    private prison corporation.
    B. Throws millions of black people in jail for no reason.
    C. Arrests Black Males to keep them from voting.
    D. Lets Judges sentence Defendants."

[*Id*. at 4].

Plaintiff argues, in part, that since these courses had no set curriculum, the questions were not "against any state curriculum." [DE 69 at ¶46]. His immediate supervisor, Tera Hands, explained in her affidavit that the Law Academy classes that Plaintiff taught were among only a few approved courses from the Florida Department of Education that do not have a defined, specified, or set curriculum. [DE 70-1 at ¶12]. Even without a "set" curriculum, other than the question relating to mass incarceration, no reasonable argument can be made that these questions in any way relate to a law course.

Plaintiff also was directed to discontinue requesting that other teachers permit his students to conduct a survey of the students in their classes, because the activity was not authorized. [DE 66-17 at 1]. The request to the teachers stated, in part, that "[a]s you know, Lakes, because of its racial demographic would be considered an Apartheid School with rationed education." [DE 66-17 at 55]. The survey had the following three questions: "1.  Do you feel like the Racial/Ethnic Makeup at this school helps or hurts the quality of education received by the students?  2.  Do you feel like the Laws passed to integrate schools in the 50's achieved their goal of providing equal education?  3. Do you feel like Lakes is an apartheid school (rationed education because of the demographic make-up of the school body)?" [*Id.* (underscore in original)].

On May 18, 2016, Dianna Weinbaum hand delivered an additional letter to Plaintiff, which advised him that during the investigation, he was immediately assigned to his residence with pay until further notice. [DE 66-19].  The letter states, in part, that: "You are directed not to have any contact with any individual who is or may be a student in the Palm Beach County School District regarding this matter." [*Id.*].  Later, it notes that: "Failure to comply with this direction will be considered insubordination and may result in disciplinary action being taken against you up to and including termination." [*Id.*]. This letter also states:

> For the duration of this investigation, you are not to speak to and/or attempt to contact any witnesses or other parties involved in this investigation, or to discuss any matters material or in any way related to the investigation.  Any attempt to do so will result in disciplinary action being taken against you.

[*Id.*].

Plaintiff continued communicating with students. Although Plaintiff takes the position that the proscription against his contacting students was limited in scope, [DE 69 at ¶50], he does not

deny that he continued to have contact with students after the May 18 letters were given to him. The student affidavit submitted by Plaintiff herein confirms that he had communicated with the student. [Declaration of Kizzy George, DE 70-5]. A witness statement confirms that several students received texts from Plaintiff on May 24, 2016 encouraging protests on the school campus. [DE 70-9 at 2].

On May 24, 2016,  Deputy Superintendent/Chief of Schools, David Christiansen, advised Plaintiff that the District had received a parent complaint[12] that he was contacting Palm Beach Lakes Community High School students and directing them to his law firm's website to a password protected portal entitled, "Law Academy." [DE 66-20 at 1].  A copy of a text message conversation was appended to the letter.  [*Id*. at 3]. Dianna Weinbaum was copied on this letter. [*Id*. at 2].

The letter continued that this violated Dianna Weinbaum's directive in her May 18, 2016 letter; that the use of student information to contact them was a violation of the Family Education Rights and Privacy Act; and that the records Plaintiff created on his website are student records that must be maintained by the District.  Finally, the letter notes that Plaintiff's behavior also may violate School Board Policy 2.503, Social Media. [*Id*. at 1-2].

Also on May 24, 2016, Dianna Weinbaum sent her own letter to Plaintiff reiterating the points raised by Mr. Christiansen.  Her letter ends as follows: "**You are directed to <u>cease and desist</u> from contacting any individual who is or may be a student in the Palm Beach County School District, as well as any witness or other party involved in the current investigation.**" [DE 66-21 (bold emphasis in original)].

_____

[12]Plaintiff disputes that a complaint was received.  Mr. Christiansen's letter is accepted by the Court not for the truth of the statements contained therein, rather, it is accepted for the purpose of showing that the letter was sent to Plaintiff, and that Plaintiff was, therefore, aware of the District's position.

Plaintiff responded to the May 24 letter by arguing that he was not in violation of the May 18 letter, because his contact with the students was not about the matter that was proscribed. [DE 66-22]. He criticized the investigation as a sham. He stated that the information on his firm's website was for any high school student, not just students of the District. He stated "it would be wise to discontinue all harassment and retaliation efforts on the part of the district." [*Id*. at 2]. He said that the request that he not contact any student in the District was overly broad, and he would disregard it. Finally, he invited the District to leave a donation on his website for his Law Camp and advised that he would be including the letter as evidence against the District in a law suit. [*Id*.].

On May 26, 2016, Mr. Christiansen sent two letters to Plaintiff. One advised that he was recommending to the Superintendent that Plaintiff's probationary contract be terminated, noting that probationary employees may be dismissed without cause. [DE 66-24]. The letter goes on to state:

> It has come to my attention that, despite the directives otherwise, you continue to contact students of the Palm Beach Lakes Community High School Law Academy, and engage in conduct which interferes with and disrupts the school and students. The District's most important consideration is the safety, education, and protection of our students and school community. As such, the immediate termination of your probationary contract is warranted.
> The termination of your probationary contract, effective May 26, 2016, will be acted upon by the School Board of Palm Beach County at a regularly scheduled meeting and will be retroactive to the effective date of your termination.

[*Id*.]. The School Board then terminated Plaintiff at its June 15, 2016 meeting. [DE 66-25].

The second letter that Mr. Christiansen sent on May 26 was labeled as a "No Trespass Directive." [DE 66-23]. The letter notifies Plaintiff that during the pendency of the investigations of the Office of Professional Standards into allegations of his misconduct, he is not allowed on the Palm Beach Lakes Community High campus or other school sites within the District. It states that

this action is being taken because Plaintiff has continued to contact students in violation of the May 18 directive. It further notes that Plaintiff is now no longer an employee and has no legitimate reason to be on school property.

 Plaintiff claims that the Florida Department of Education found that he had not violated the rules cited by the District. [DE 69 at ¶¶31, 35, 37, 38]. The letter from the Department of Education is dated July 7, 2017, a little over a year after Plaintiff was terminated from his employment with the School District. [DE 70-13]. Without explanation, the letter simply states that "the Office of Professional Practices Services has determined at this time further action by this office is not warranted." [*Id*]. The letter references Case No. 167-1216. Plaintiff produced his letter dated May 17, 2017, which is his response to the complaint that was before the Office of Professional Practices Services. [DE 70-10]. The Court does not have before it a complaint with that reference number.[13]

## II.  Summary Judgment Standard

The Court may grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The stringent burden of establishing the absence of a genuine issue of material fact lies with the moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

The movant "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp.*, 477 U.S. at 323. After the movant has met its burden

---

[13]Plaintiff identifies an exhibit as a "racially offensive letter" that was sent to the FLDOE (presumably referring to the Florida Department of Education). [DE 69 at ¶49]. The referenced exhibit is DE 70-12. This exhibit does not indicate that it was sent to the FLDOE. The case number does not match the FLDOE case number. It indicates that it was prepared May 31, 2016.

under Rule 56(a), the burden of production shifts and the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electronic Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record . . . or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A) and (B). Evidence submitted in connection with the motion is construed in the light most favorable to the non-moving party, *see Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 807 (11th Cir. 2011)(en banc), and all reasonable inferences from the evidence must be made in his favor. *See Skop v. City of Atlanta*, 485 F.3d 1130, 1136 (11th Cir. 2007).

### III. Discussion

Plaintiff's Complaint [DE 1] sets forth the following ten counts:

I.  Violation of his constitutional rights under color of law pursuant to 42 U.S.C. §1983 and §1988.

II. Violation of 42 U.S.C. §1983 based upon policies or customs exhibiting deliberate indifference to the constitutional rights of persons who were teachers within the Palm Beach County School District.

III. Violation of 42 U.S.C. §1983 by retaliating against Plaintiff for exercising his First Amendment right to freedom of speech.

IV. Violation of Equal Protection of the Law under the 14th Amendment to the Constitution and 42 U.S.C. §1983.

23

V.  Violation of 42 U.S.C. §§1985 and 1986 for conspiracy and failure to prevent conspiracy to protect federally protected rights.

VI. Race Discrimination in Violation of Title VII of the Civil Rights Act of 1964.

VII. Retaliation in Violation of Title VII of the Civil Rights Act of 1964.

VIII. Violation of Procedural Due Process in Violation of the Fourteenth Amendment.

IX.  Violation of Substantive Due Process in Violation of the Fourteenth Amendment.

X.  Respondeat Superior on the part of the school district for the acts of the other Defendants.

Plaintiff describes his case as a "race discrimination and retaliation action and retaliation for conduct protected by the First Amendment . . . ." [DE 70 at 2].  He claims to have been "subjected to [a] hostile work environment, subjected to race discrimination, and retaliated against after objecting and for conduct protected by the First Amendment." [*Id.*].

Defendants seek summary judgment as to all ten counts.

## COUNT I

Summary Judgment is granted as to Count I, because it fails to state a claim. All it does is incorporate all preceding paragraphs and request damages. [DE 1 at 13].  By proceeding in this fashion, Plaintiff has incorporated facts that in no way relate to this specific count.  *See Greif v. Jupiter Med. Ctr., Inc.*, No. 08-80070-CIV, 2008 WL 2705436, at * 4 (S.D. Fla. July 9, 2008) (in referencing other numbered paragraphs, care should be taken so that only relevant paragraphs of the complaint are referenced).

24

Furthermore, a claim must do more than simply plead damages. Subsequent claims elaborate more fully Plaintiff's allegations under 42 U.S.C. §§1983 and 1988 and will be separately discussed herein.

**COUNT II**

Count II alleges a violation of 42 U.S.C. §1983 based upon policies or customs exhibiting deliberate indifference to the constitutional rights of persons who were teachers within the Palm Beach County School District.[14] [DE 1 at 13-14]. First, Defendants properly note that to the extent this Count contains claims against the individual Defendants in their official capacities, they must be dismissed, and Plaintiff does not respond to this argument.  These claims are the functional equivalent of section 1983 claims against the local government entity for which the individuals work. *See Busby v. City of Orlando*, 931 F.2d 764, 776 (11th Cir. 1991) ("when an officer is sued under Section 1983 in his or her official capacity, the suit is simply another way of pleading an action against an entity of which an officer is an agent.") (internal quotation marks omitted). Based upon

---

[14]In their Motion to Dismiss, which they incorporated in their summary judgment motion papers, Defendants argue that Plaintiff improperly named the "School District" of Palm Beach County as a Defendant instead of the proper entity, the "School Board" of Palm Beach County. [DE 18 at 4-5].  Plaintiff responded by noting that he properly named the Board by referring to the Palm Beach County School District (Board).[DE 29 at 5]. Defendants did not address Plaintiff's response in their reply [DE 30], nor do they specifically raise this issue in their Motion for Summary Judgment.  Paragraph 18 of the Complaint states: "Defendant Palm Beach County School District (Board) is a County Agency and the public employer of all other named Defendants.  The Board, (its members and agents acting on behalf of the board) are that which gave rise to this claim for relief. . . ." [DE 1].  The Court finds that Plaintiff has adequately identified and sued the correct party.  The Court will use the phrase "School District" and "School Board" interchangeably to refer to this one party.

this precedent, the Court grants summary judgment as to Count II to the extent it contains claims against the individual Defendants in their official capacities.

Count II fails to set forth any allegations against the individual Defendants in their individual capacities; so, summary judgment will similarly be granted as to them.

Summary judgment must also be granted to the School District as to Count II. "The Supreme Court has placed strict limitations on municipal liability under § 1983." *Grech v. Clayton Cnty.*, 335 F.3d 1326, 1329 (11th Cir. 2003) (citing *City of Canton v. Harris*, 489 U.S. 378, 385 (1989) and *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)). A city's liability under Section 1983 "may not be based on the doctrine of respondeat superior." *Id.* A government entity is liable under Section 1983 only for acts for which the government entity is actually responsible. *See Marsh v. Butler Cnty.*, 268 F.3d 1014, 1027 (11th Cir. 2001)(*en banc*), *abrogated on other grounds by, Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 561-63 (2007). "Indeed, a [local government entity] is liable only when the . . . 'official policy' causes a constitutional violation." *Grech*, 335 F.3d at 1329. Thus, Plaintiff must "'identify a municipal 'policy' or 'custom' that caused [his] injury.'" *Id.* (quoting *Gold v. City of Miami*, 151 F.3d 1346, 1350 (11th Cir. 1998)).

A § 1983 plaintiff has two methods by which to establish a policy: identify either (1) an officially promulgated policy or (2) an unofficial custom or practice shown through the repeated acts of a final policymaker. *Grech*, 335 F.3d at 1329. "Because a [school board ] rarely will have an officially-adopted policy of permitting a particular constitutional violation, most plaintiffs . . . must show that the [school board] has a custom or practice of permitting it and that the [school board]'s

26

custom or practice is 'the moving force [behind] the constitutional violation.'" *Id.* at 1330 (quoting *City of Canton*, 489 U.S. at 389).

To establish "§ 1983 liability against a [government entity] based on custom, a plaintiff must establish a widespread practice that, although not authorized by written law or express . . . policy, is so permanent and well settled as to constitute a custom or usage with the force of law." *Brown v. City of Fort Lauderdale*, 923 F.2d 1474, 1481 (11th Cir. 1991)(internal quotation marks omitted) (quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988)); *See also Wayne v. Jarvis*, 197 F.3d 1098, 1105 (11th Cir. 1999), *overruled on other grounds, Manders v. Lee*, 338 F.3d 1304 (11th Cir. 2003) ("[t]o establish a policy or custom, it is generally necessary to show a persistent and widespread practice.").

Count II contains nothing other than conclusory statements that the School District has policies or customs that are discriminatory. In response to the pending motion, Plaintiff has failed to provide any facts in admissible form demonstrating an official or unofficial discriminatory policy or custom meeting the above-cited standards, that caused the constitutional violations alleged in Count II. He has similarly failed to provide any evidence to support his allegation that the School District failed to train or supervise its employees. Summary judgment is, therefore, granted to the School District as to Count II.

## COUNT III

Count III alleges a violation of Plaintiff's First Amendment rights under 42 U.S.C. §1983. Plaintiff alleges that he was retaliated against for the exercise of this right. [DE 1 at 14-15].   This

Count must be dismissed as to the School District, because as with Count II, there are no facts in admissible form showing a policy or custom.  It must be dismissed as to the individuals in their official capacities for the reason discussed above. What remains for consideration is whether Plaintiff has a viable claim against the individual Defendants, in their individual capacities, for retaliation against Plaintiff due to the exercise of his First Amendment Rights.

The individual Defendants, in their individual capacities, challenge this Count in their moving papers by arguing that they are entitled to qualified immunity; that Plaintiff does not meet the tests set forth in *Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968); and that Plaintiff's retaliation claim fails under the mixed-motive defense.  Plaintiff denies these arguments.

The individual Defendants meet the initial threshold for the application of qualified immunity, namely, that they were acting within the scope of their discretionary authority when the allegedly wrongful acts occurred. *See, e.g., Brown v. City of Huntsville,* 608 F.3d 724, 734 n.14 (11th Cir. 2010). There is no evidence in admissible form before the Court demonstrating that any of the acts were outside the scope of Defendants' discretionary authority.

The burden thus shifts to Plaintiff to demonstrate that the individual Defendants are not entitled to qualified immunity, because their acts violated a constitutional right of the Plaintiff, and that right was clearly established at the time of the violation. *See Bennett v. Hendrix*, 423 F.3d 1247, 1250 (11th Cir. 2005).

In their moving papers, the Defendants argue that this inquiry should end at the evaluation of whether there was a constitutional violation. They argue that the First Amendment is not even

28

implicated in this case.  Defendants state that the record contains no indication that any of them were dissatisfied or in any way affected by the students' attendance at the Board meeting. [DE 65 at 15-16].  This description of the impact of the appearance at the Board meeting is, however, belied by the testimony before the Court.

Dr. Avossa described the "blow up" that occurred after the meeting. [DE 66-3 at 251].  He testified that he was only made aware of issues regarding Plaintiff after the meeting. [*Id*. at 255].  "I was only brought into the situation after it sort of, to use the term, like sort of blew up where all of a sudden the newspaper is asking questions, the Board is asking questions, that's when I was made aware of it." [*Id*. at 256].  He stated that "the swirl came from the incident at the School Board meeting." [DE 57-1 at 56, lines 21-22].

Cheryl McKeever testified that she told Plaintiff after the School Board meeting that out of respect for protocol, the issue should have been addressed with her as the building principal. [DE 66-2 at 204-05]. She testified, "I was understanding from both of us that as we proceed forward, that we were on the same accord with you allowing to continue to teach our children about the law, but also teaching them how to use it in a manner that is, that's in proper accordance and direction." [*Id*. at 206].

At this stage of the proceedings, this evidence must be construed in the light most favorable to Plaintiff.  Therefore, the Court rejects Defendants' argument that there is no possibility of a First Amendment violation here.

Defendants also argue that Plaintiff's actions were taken in his role as a public employee and

not as a private citizen.  "[I]f the employee spoke as an employee and on matters of personal interest, the First Amendment is not implicated."  *Alves v. Board of Regents of the Univ. Sys. of Georgia*, 804 F.3d 1149, 1160 (11th Cir. 2015).  "[T]he line between speaking as a citizen or as a public employee turns on whether the speech 'owes its existence to a public employee's professional responsibilities.'"  *Carollo v. Boria*, 833 F.3d 1322, 1329 (11th Cir. 2016) (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 421-22 (2006)).  Whether a public employee spoke as a citizen on a matter of public concern is a question of law.  *Alves*, 804 F.3d at 1159.

The Court finds, as a matter of law, that the speech at issue, namely, Plaintiff's appearance at the School Board meeting in support of his students' complaints that they did not have a qualified geometry teacher, constitutes speech by a citizen on a matter of public concern.  Whether there was a geometry teacher had no impact on Plaintiff as an employee of the School District. Addressing the absence of a geometry teacher was in no manner Plaintiff's responsibility.  It did not impact his ability to do his job.  It did not constitute a grievance relating to his personal situation at the school.

As the Eleventh Circuit noted in *Carollo*,

[T]he mere fact that a citizen's speech concerns information acquired by virtue of his public employment does not transform that speech into employee–rather than citizen–speech. The critical question under Garcetti is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties . . . .

*Carollo*, 833 F.3d at 1329 (citation omitted).  The Eleventh Circuit further noted that

Garcetti's phrase "owes its existence to . . . must be read narrowly to encompass speech that an employee made in accordance with or in furtherance of the ordinary responsibilities of her employment, not merely speech that concerns the ordinary

responsibilities of her employment."

*Id.* (citation omitted).  Here, Plaintiff's attendance at the Board Meeting was not in furtherance of the

ordinary responsibilities of his employment.[15]

The Eleventh Circuit opinion in *Maples v. Martin*, 858 F.2d 1546 (11th Cir. 1988) is

instructive regarding the requirement that the speech be on a matter of public concern.  "[T]eachers

whose speech directly affects the public's perception of the quality of education in a given academic

system find their speech protected." [*Id.* at 1553].  In *Maples*, it was held that the plaintiff's speech

"involves substantive issues that could influence the public's perception of the quality of education

provided by the Department.  Specifically, the Review points to weaknesses in the curriculum,

inadequate facilities, a low faculty-to-school ratio and the poor performance of Auburn graduates on

the professional licensing exams . . . ." [*Id.*].

Nor is the fact that Plaintiff did not himself "speak" determinative here.  The First

Amendment encompasses not only actual speech, but also freedom of association with those who are

speaking.  As the Eleventh Circuit noted in *Hatcher v. Board of Public Educ. and Orphanage*, 809

F.2d 1546, 1557 (11th Cir. 1987), "Appellant's associational activity is no less protected because

appellant chose to add the support of her silent presence to the efforts of those who took a more

---

[15]Defendants argue that an e-mail that Plaintiff sent to Dr. Avossa after the Board meeting clearly establishes that Plaintiff considered his actions to be part of his responsibilities as the Law Academy teacher. [DE 65 at 17].  This letter, however, does not address the School Board meeting at all.  The letter relates to Dr. McKeever's meeting with the students on March 17, which was the day after the Board meeting. [DE 66-6].

active role."

The *Maples* and *Hatcher* cases demonstrate that Plaintiff engaged in a constitutionally protected First Amendment activity.  What remains for the Court's evaluation of Defendants' assertion of qualified immunity is whether Defendants[16] engaged in retaliatory conduct which adversely affected the protected speech or act and whether there is a causal connection between the retaliatory actions and the adverse effect on the constitutionally-protected speech or act.

Plaintiff raises the following claims of retaliation allegedly taken against him for the exercise of his First Amendment rights:  Defendants began an investigation into Plaintiff immediately after the meeting; Plaintiff was barraged by accusatory letters from various arms of the school district; Plaintiff was suspended; Plaintiff was non-renewed; Plaintiff was terminated. [DE 70 at 14].

Defendants assert that the only arguably adverse action here was Plaintiff's termination. [DE 65 at 4-5].  They claim that none of the other actions involved an important condition of employment, citing to *Akins v. Fulton Cnty., Ga*., 420 F.3d 1293, 1300 (11th Cir. 2005).  The applicability of this test, however, has been questioned. *Nash-Utterback v. Sch. Bd. of Palm Beach Cty.*, No. 11-CV-80513-JMH, 2012 WL 12865852 *15–16 (S.D. Fla. June 8, 2012) notes:

> It is not settled whether *Burlington* [*N. and Santa Fe Ry Co. v. White*, 548 U.S. 53 (2006)] overruled the Eleventh Circuit's "important condition of employment"

---

[16]Defendants have not presented any evidence or argument to distinguish the individual Defendants from one another relative to the question of who among them was in a position to retaliate against Plaintiff.  It is not the Court's function to be an advocate for any particular Party. The Court will, therefore, treat all of the individual Defendants as they have asked to be treated – as one and the same.

standard for retaliation claims under the First Amendment, which was established by *Stavropoulos* and *Akins.* Several Circuits either adopted the *Burlington* standard in First Amendment retaliation cases, or have been using similar standards. *Couch v. Bd. of Trustees of Mem'l Hosp. of Carbon Cnty.,* 587 F.3d 1223, 1237-38 (10th Cir. 2009) (collecting cases from the Seventh, Second, and Sixth Circuits, contrasting them with *Akins,* and electing to consider whether the employer's specific action would deter a reasonable person from exercising his First Amendment rights); *but see DePree v. Saunders,* 588 F.3d 282, 288 (5th Cir. 2009) (finding no clearly established law for the purposes of qualified immunity because "this court has not normally applied *Burlington* to First Amendment retaliation claims"). The Eleventh Circuit noted that the standards for the adverse employment action requirement for the First Amendment and Title VII retaliation claims are consonant and relies on Title VII and First Amendment retaliation cases interchangeably. *Akins v. Fulton Cnty., Ga.,* 420 F.3d 1293, 1301 n. 2 (11th Cir. 2005). Therefore, the *Burlington* standard applies to this case. *See Tatroe v. Cobb Cnty., Ga.,* 1:04-CV-1074-WSD, 2008 WL 361010 at *6 (N.D. Ga. Feb. 8, 2008). This will also be in accord with the Eleventh Circuit's standard for private citizens alleging retaliation for exercising First Amendment rights. *See Bennett v. Hendrix,* 423 F.3d 1247, 1252-54 (11th Cir. 2005). That standard states that a plaintiff suffers adverse action if the defendant's allegedly retaliatory conduct would likely deter a person of ordinary firmness from the exercise of First Amendment rights. *Id.*

Thus, Plaintiff must show that a reasonable employee would have found the challenged action materially adverse, or that such action might have dissuaded a reasonable worker from engaging in protected conduct or assisting another in doing so. *See Burlington N. and Santa Fe Ry. Co. v. White,* 548 U.S. 53, 68-70 (2006). The complained-of action cannot be a trivial harm, a petty slight or a minor annoyance. *Id.* While the standard is objective, context is important. *Id.* Many workers may not consider a schedule change to be significant, but such a change may matter tremendously to a young mother with school-age children. *Id.*

*Nash-Utterback v. Sch. Bd. of Palm Beach Cty.*, No. 11-CV-80513-JMH, 2012 WL 12865852, at *15–16 (S.D. Fla. June 8, 2012).  *See also, Butler v. Johnson*, No. 4:16CV222-RH/CAS, 2017 WL 80256, at *1 (N.D. Fla. Jan. 9, 2017)(agreeing with *Nash* that older Eleventh Circuit cases adopting a more exacting standard for a retaliation claim are no longer good law).

*Nash* also notes that "adverse actions in combination may chill Plaintiff's desire to engage in protected conduct."  *Id*. at *16.

There can be little argument that Plaintiff's termination satisfied every test for an adverse employment action. Although Defendants note that Leigh was a first-year, probationary employee who could be terminated with or without cause and without progressive discipline by virtue of his probationary status, [DE 66 at ¶¶ 40-41], the Supreme Court has held that a county employee who is merely probationary and can be discharged for any reason or for no reason at all may be entitled to reinstatement if the employee is discharged for exercising a constitutional right to freedom of expression. *Rankin v. McPherson*, 483 U.S. 378, 383-84 (1987).

In light of the ultimate adverse action of termination, it is not necessary for the Court to analyze whether the other acts Plaintiff alleges to have been adverse employment actions rise, either individually or cumulatively, to a level that would deter a person of ordinary firmness from the exercise of his First Amendment rights.  Furthermore, even if every act Plaintiff identifies as retaliatory were held to be so, it would have no impact on the Court's ultimate decision below.

The final step in the analysis of whether the individual Defendants are entitled to qualified immunity is whether there is a causal connection between the retaliatory actions and the adverse effects on the constitutionally protected speech. Plaintiff's position is that everything that Defendants did subsequent to the School Board meeting relates to what occurred there [DE 70 at 14, DE 66-1 at 319-320].

Evaluating the evidence in the light most favorable to Plaintiff, as the Court must do at this time, Plaintiff has raised a question of fact as to whether his First Amendment expression caused the

retaliation against him.  A jury could find that Dr. Avossa's testimony that a "blow up" occurred

after the meeting, and that "the swirl came from the incident at the School Board meeting," shows a

potential causal link between Plaintiff's attendance at the meeting and the retaliation.  Furthermore,

Phillip Stillman, the Junior and Senior Law Academy Teacher at the time of the events at issue,

stated in his affidavit: "When Mr. Leigh's students went to the School Board to ask the School

Board for help getting a teacher, I observed the increased scrutiny Mr. Leigh and his students

received." [DE 70-2 at 3, ¶12].  He further stated: "It was very clear that as a result of Mr. Leigh's

students appearing before the school board Mr. Leigh became a target for removal." [DE 70-2 at

¶22].

        This question of fact does not, however, end the inquiry as to qualified immunity.

Defendants argue that the testimony of Principal McKeever and the other administrative-level

employees is unequivocal with regard to why the various decisions were made, and by whom, and

that there were justifiable, legal reasons for the various investigations and discretionary decisions

[DE 65 at 19].

> [I]n determining contested issues of causation, the defendant is entitled to qualified
> immunity "[w]here the facts assumed for summary judgment purposes . . . show
> mixed motives (lawful *and* unlawful motivations) and pre-existing law does not
> dictate that the merits of the case must be decided in plaintiff's favor." *Foy v.
> Holston*, 94 F.3d 1528, 1535 (11th Cir. 1996).

*Brannon v. Finkelstein*, 754 F.3d 1269, 1279 (11th Cir. 2014).

        Even assuming that part of the motivation for Defendants' actions subsequent to the School

35

Board meeting related in part to that meeting, it is unrefuted that there were other motivations for the actions taken by Defendants.  This would be a very different case had Plaintiff done nothing other than stand beside his student at the School Board meeting, and Defendants had, thereafter, taken the actions they took.  But that is not the case before the Court.

Commencing immediately after the School Board meeting, when Plaintiff intervened in the meeting that Camille Coleman had with the students and their parents, the evidence is indisputable that Plaintiff repeatedly antagonized Defendants by objecting to how they were approaching the underlying issue raised by the students at the School Board meeting and how he was being treated. Plaintiff does not enjoy any First Amendment protection from retaliation for complaining about these kinds of management decisions, because they are not matters of public interest.  *See Maples v. Martin*, 858 F. 2d 1546, 1552 (11th Cir. 1988)("speech that concerns internal administration of the educational system and personal grievances will not receive constitutional protection.").

Furthermore, Plaintiff's actions went far beyond merely criticizing management.  He was repeatedly insubordinate, ignoring express directions to cease his contact with the students.  He was specifically advised that a failure to comply could result in disciplinary action being taken against him "up to and including termination." [DE 66-19].  Employees do not have constitutional protections from retaliation by their employers for insubordinate behavior.

Thus, the record supports a finding of mixed motives for Defendants' actions. There is no pre-existing law of which this Court is aware that would require the merits of this case be decided in

36

Plaintiff's favor on the very unique facts that occurred after the School Board meeting.  Since the law is not clearly established on these facts, Defendants could not reasonably have known that if they retaliated against Plaintiff based, in part, on legal motives, they would be held to have violated Plaintiff's First Amendment rights. The Individual Defendants are, therefore, entitled to qualified immunity as to Count III.[17]  Summary judgment dismissing this Count shall be granted.

## COUNT IV

Count IV alleges that all Defendants deprived Plaintiff of the equal protection of the law guaranteed by the 14th Amendment to the Constitution, and, therefore, violated 42 U.S.C. §1983. [DE 1 at 15-16].  This Count must be dismissed as to the School District, because as with Counts II and III, there are no facts in admissible form showing a policy or custom.  It must be dismissed as to the individuals in their official capacity for the reason discussed above as to Count II.  What remains for consideration is Plaintiff's claim that the individual Defendants, in their individual capacities, violated Plaintiff's right to equal protection under the law.

Defendants concede that Plaintiff belongs to a protected class; assume *arguendo* that he was qualified for his position; and concede that he was subjected to adverse employment action when he was terminated.  They move for summary judgment on this Count based upon the absence of any similarly situated employees who are outside his class, and who were treated more favorably than he

---

[17]Plaintiff's reliance upon *Quigg v. Thomas Cnty. Sch. Dist.*, 814 F.3d 1227 (11th Cir. 2016), is misplaced.  *Quigg* does not address the issue of qualified immunity.

was. [DE 65 at 11].  They note the requirement that comparators be "similarly situated in all relevant respects."  *Lee v. U.S. Steel Corp.*, 450 Fed. Appx. 834, 839 (11th Cir. 2012).

In response, Plaintiff states that "he was summarily replaced by a less qualified white person, establishing a prima facie case for race discrimination . . . ." [DE 70 at 4].  Plaintiff cites to no evidence in support of this assertion.  Defendants have presented evidence in admissible form establishing that Plaintiff's position was not filled after he was terminated. *See* footnote 9, *supra*.

Furthermore, Plaintiff presents no evidence of any comparators similarly situated in all relevant respects for any of his many allegations. Summary Judgment will, therefore, be granted as to this Count.

## COUNT V

Count V alleges that all Defendants conspired to deprive Plaintiff of his constitutional rights under 42 U.S.C. §§ 1985 and 1986.[18] A necessary element of these provisions is that there exist a deprivation of an individual's right to equal protection under the law.  As discussed *supra*, there is no evidentiary support for Plaintiff's allegations of a deprivation of his right to equal protection under the law.  *See* discussion above regarding Count IV.  In the absence of this underlying predicate, there can be no conspiracy relative thereto.  This alone is sufficient to warrant an award of summary judgment as to this Count.

---

[18]Although the Complaint does not designate which section of 1985 is allegedly at issue, Plaintiff's responding papers clarify that the section is 1985(3). [DE 70 at 17].

Additionally, Defendants seek summary judgment as to this claim on the basis of the

intracorporate conspiracy doctrine. [DE 65 at 5-6]. The Eleventh Circuit has explained this doctrine

as follows:

> [t]he intracorporate conspiracy doctrine holds that acts of corporate
> agents are attributed to the corporation itself, thereby negating the
> multiplicity of actors necessary for the formation of a conspiracy.
> [U]nder the doctrine, a corporation cannot conspire with its
> employees, and its employees, when acting in the scope of their
> employment, cannot conspire among themselves.

*Grider v. City of Auburn*, 618 F.3d 1240, 1261 (11th Cir. 2010)(alterations in original)(citations

omitted).  As in *Grider*, all of the acts Defendants are alleged to have taken involved job-related

functions well within Defendants' scope of employment.  The Eleventh Circuit in *Grider* made clear

> that one might reasonably believe that violating someone's
> constitutional rights is never a job-related function or within the
> scope of . . . employment.  However, the question of whether a
> defendant acted within the scope of his employment is distinct from
> whether the [employee] . . . was performing a function that, but for
> the alleged constitutional infirmity, was within the ambit of the . . .
> scope of authority (i.e., job-related duties) and in furtherance of the
> employer's business.

*Id*.

The Eleventh Circuit noted that other circuits have recognized the following exceptions to

this doctrine:

> (1) for "convictions involving criminal charges of conspiracy," (2) where the
> employee has an "independent personal stake" in his unconstitutional acts and is not
> acting to further the corporation's illegal objective, or (3) where the employees

"engage in a series of discriminatory acts as opposed to a single action" over a
significant period of time in the employment setting.

*Id.* at 1262(citation omitted).

Plaintiff seeks to fall within the latter two of the above-mentioned exceptions. As to the

"independent personal stake" exception, Plaintiff argues that: "Because of the Plaintiff's Whistle-

blower disclosures and the media attention after the school board meeting, McKeever, Avossa, and

the District, had clear incentive [to] protect their reputations and their continued employment,

mobilizing them to act." [DE 70 at 21].[19]  Plaintiff further argues that: "A reasonable jury could

conclude that Def. Avossa and board members had an interest in conspiring to retaliate, suspend, and

then subsequently terminate the Plaintiff to quash a broader investigation along with concealing the

District's continuing failure to educate children of color." [*Id.*].

Plaintiff has failed to submit any evidentiary support for these arguments.  None of

Plaintiff's references in this portion of his brief support his conclusory arguments.  Furthermore, he

does not present any arguments as to Defendants Coleman, Weinbaum, Epps, Christiansen, Davis,

and Lee.

The only case he cites, *Hartman v. Board of Trustees*, 4 F.3d 465 (7th Cir. 1993), in addition

---

[19]Although not necessary for the Court to arrive at its decision on this argument, Plaintiff
has provided no case holding that an employee's interest in protecting his or her reputation and
continued employment constitutes the kind of "independent personal stake" that such an
exception would require.  All employees have an interest in protecting their reputations and jobs.
It appears to the Court that such an exception would subsume the intracorporate conspiracy
doctrine.

to being non-binding on this Court, actually supports Defendants' position that the exception is not applicable here.  In refusing to apply the exception, the *Hartman* court noted that since the plaintiff did not attempt to show that the interests of the colleges played no part in the decisions at issue, the court could not conclude that the defendants acted outside the scope of their employment.  Here, not only has Plaintiff failed to show that the interests of the School District played no part in the decisions, by arguing that Defendants were "concealing the District's continuing failure to educate children of colour," [DE 70 at 21], Plaintiff essentially argued that the interests of the District played a part in the decisions which were made. Therefore, Plaintiff is not entitled to the application of the exception.

Plaintiff also asserts that he falls under the exception applicable where the employees "engage in a series of discriminatory acts as opposed to a single action" over a significant period of time in the employment setting. [DE 70 at 18-21]. Defendants do not address this potential exception in either their main brief or their reply brief.

There is no guidance from the Eleventh Circuit as to whether it would adopt this exception, and under what facts it would do so.  An argument can be made that the number of acts should be irrelevant given the premise of the intracorporate conspiracy doctrine, namely, that a corporation cannot conspire with its employees, and its employees, when acting in the scope of their employment, cannot conspire among themselves.

The Court need not reach this issue.  While Plaintiff sets forth a laundry list of alleged acts to

try to establish that the Defendants engaged in a series of discriminatory acts, [DE 70 at 18-21], he fails to articulate how any of these constitute a violation of the equal protection of the laws clause, which, as noted above, is a required element of this Count.

Summary Judgment is, therefore, granted as to Count V.

## COUNT VI

Count VI alleges race discrimination in violation of Title VII of the Civil Rights Act of 1964. [DE 1 at 18].

Defendants correctly note that the Title VII claims against the individual Defendants must be dismissed on the basis that they are not employers under Title VII.  *See Dearth v. Collins*, 441 F.3d 931, 933 (11th Cir. 2006) ("relief granted under Title VII is against the employer, not [against] individual employees whose actions would constitute a violation of the Act.") (alterations in original)(citation omitted).

Plaintiff's claim against the School District fails due to the absence of any evidence in admissible form regarding similarly situated employees outside Plaintiff's class who were treated more favorably than he was. *See* discussion *supra* as to Count IV.[20]  Summary judgment will, therefore, be granted as to this Count.

---

[20]Claims under 42 U.S.C. §1983 and Title VII have the same elements of proof and use the same burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Pennington v. City of Huntsville*, 261 F.3d 1262, 1265 (11th Cir. 2001).

### COUNT VII

Count VII alleges a claim for retaliation in violation of Title VII of the Civil Rights Act of 1964. [DE 1 at 19].  Plaintiff alleges that Defendants engaged in unlawful retaliatory practices by suspending and terminating his employment, "because he opposed and voiced discriminatory practices to the Defendants." [*Id.* at ¶109].  Plaintiff argues that he "engaged in protected activity when he practiced his First Amendment Rights at a public school Board meeting, wrote grievance correspondence to the Superintendent of Schools and the School Board of Palm Beach County, and filed an EEOC charge in May of 2016." [DE 70 at 8].

As with Count VI, the Title VII claims against the individual Defendants must be dismissed on the basis that they are not employers under Title VII.  *See Dearth v. Collins*, 441 F.3d 931, 933 (11ᵗʰ Cir. 2006).

Retaliation claims brought under Title VII are subject to the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *Williams v. Florida Atlantic University*, 728 Fed. Appx. 996, 1000 (11ᵗʰ Cir. 2018).  To establish a prima facie case for retaliation under Title VII, Plaintiff must show that: 1) he engaged in protected activity; 2) he suffered an adverse employment action; and 3) there is some causal relationship link between his protected activity and the adverse employment action. *Quigg v. Thomas County School Dist.*, 814 F.3d 1227, 1244 (11ᵗʰ Cir. 2016).

Title VII protects an employee from discrimination if "he has opposed any practice made an

unlawful employment practice by this subchapter or because he has made a charge, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-(3)a. The kinds of unlawful employment practices addressed by this section are those relating to protected characteristics -- race, color, religion, sex or national origin. 42 U.S.C. §2000e-2.

Plaintiff claims that he engaged in protected activity under Title VII by filing an EEOC charge.  Since Plaintiff agreed that this EEOC charge was filed **after** Plaintiff's termination, [DE 66 at ¶62, DE 69 at ¶62], it cannot be the cause of any alleged retaliation, and, therefore, provides no support for his Title VII claim.

Plaintiff also claims to have engaged in protected activity when he practiced his First Amendment Rights at the School Board meeting.  Plaintiff was asked at his deposition:

> Q.  Did the students have any claims of racial discrimination
> that they brought to the attention of the School Board?
> A.  They didn't say it. . . .
> Q.  Did you speak at the meeting?
> A.  I didn't - - verbally, no.

[DE 66-1 at 113, lines 3-9].

In light of this testimony, and there being no evidence before the Court that there were any allegations raised at the meeting relating to any other protected characteristic under Title VII, this did not constitute protected activity under Title VII.

The Court now turns to Plaintiff's contention that his grievance correspondence to the Superintendent of Schools and the School Board of Palm Beach County constituted protected activity under Title VII.

Plaintiff's March 18, 2016 email to Superintendent Avossa complains about how Ms. Coleman and Principal McKeever were handling the issue raised by the students at the School Board meeting.  No mention is made of a protected characteristic being the basis for Plaintiff's concerns. [DE 66-6].  Therefore, this is not a protected activity under Title VII.

Although not written by Plaintiff, his law firm's undated letter signed by his law partner, Danielle Watson, stamped received by the Office of the Superintendent on March 29, 2016, put Dr. Avossa, the Palm Beach County School Board, and Cheryl McKeever, on notice that the firm was representing students in the Geometry class. In the almost three page, single-spaced letter, no mention is made of a protected characteristic being the basis for the alleged claim. [DE 66-7 at 1-3]. Nor is there any mention of a protected characteristic in the May 9, 2016 letter from Watson Leigh, [*Id.* at 4], or the undated letter placing these parties on notice regarding incidents unrelated to the Geometry students [*Id*. at 5-8].  These letters do not constitute protected activities under Title VII.

Plaintiff's April 12, 2016 "Request for Protection and Disclosure under F.S. §112.3187" sent to Superintendent Avossa and the School Board is over three pages and single-spaced.  No mention is made of a protected characteristic. [DE 66-9].  This is not a protected activity under Title VII.

In correspondence dated June 3, 2016 from Plaintiff to Lung Chiu, Plaintiff states that he

"was suspended, then terminated in retaliation for my March 16, 2016 visit to the School Board

Meeting, **AND** after my April 12th letter . . . ." [DE 66-11 at 5].  Thus, Plaintiff states the cause of his

suspension and termination were activities which, as demonstrated above, are not covered by Title

VII.

On May 3, 2016, Plaintiff sent a letter to Dianna Weinbaum entitled, "Response to Concern

of Professional Conduct."  This is the first time that any comment regarding discrimination appears

in Plaintiff's correspondence to Defendants.  The letter states, in part:

> Cheryl McKeever has engaged in purposeful harassment of students
> and faculty; she has created a hostile work environment for staff
> which has resulted in the poor delivery of education for the students
> at Palm Beach Lakes Community High School.  She, under the
> direction and support of the District, has engaged in blatant
> discrimination, put special needs children in danger, and oversees a
> staff that has denied physical protection of students, staff and visitors.

[DE 98 at 3].  The letter also states, in part:

> The district has sought to harass, intimidate, discredit, and make any
> and all attempts to take away my property rights in the position I hold
> without proper notice of termination by posting my position without
> proper notice (May 1, 2016) in retaliation for exercising my first
> amendment right to participate in a public school board meeting to
> support students that this district has racially an[d] economically
> discriminated against, for teaching my students that their rights under
> Florida Law by this school and school district, and for exposing the
> widespread civil rights and educations rights violations being
> perpetrated by this school and school district.

[*Id*. at 2-3].  The letter also advises that Plaintiff will be commencing a lawsuit on behalf of himself

and similarly situated teachers with various claims, including constitutional rights violations and racial discrimination. [*Id*. at 3].

By undated letter received by the Superintendent's office on May 13, 2016, Plaintiff's law firm put Superintendent Avossa, Cheryl McKeever and the Palm Beach County School Board on notice that it represents Plaintiff individually and as a class representative for similarly situated persons.  The letter alleges harassing acts of racial and gender discrimination, but provides no details. [DE 66-16].

On May 17, 2016, Plaintiff filed a complaint against the Palm Beach County School District with the United States Department of Justice, Education Department requesting that the Department of Justice investigate what was transpiring at the school. [DE 70-27 at 5-7]. This letter states that "the violations, intimidation, harassment, and theft of federal funds and other civil rights violations cannot continue . . . ." [*Id*. at 7].  No factual details as to the "civil rights violations" are set forth.

 The May 17 letter was updated on May 25, 2016. [*Id*. at 1-4].  This letter refers to 9-10 teachers who have filed EEOC Title VII complaints.  It further notes that the student body is over 98% minority, making this a Brown and Title VI issue. [*Id*. at 2].  The United States Department of Education, Office for Civil Rights, by letter dated July 22, 2016, advised Plaintiff that it had received his complaint alleging discrimination on the basis of race and retaliation on May 30, 2016. [DE 70-14]. The letter states that the District has been informed of the prohibition against retaliation. [*Id*. at 2].

There is no evidence before the Court as to when the District saw the May 17 and May 25 letters.  Plaintiff mentions having filed a complaint with the Department of Justice in his letter to Ms. Weinbaum and Mr. Christiansen dated May 24, 2016 [DE 66-22 at 2], but there is no evidence before the Court that the District had seen the May 17 complaint at that time. The updated letter was sent the day after Plaintiff's May 24 letter.  There is no evidence before the Court of when Defendants received the updated complaint. Furthermore, there is no evidence establishing when the District received the notification from the Department.

Accepting this evidence in the light most favorable to Plaintiff, the Court will treat the May 3, 2016; May 13, 2016; May 17, 2016; and May 25, 2016 letters as protected activities. Since it is unquestioned that Plaintiff's termination constitutes an adverse employment action, the remaining element that Plaintiff must demonstrate to sustain his burden of showing that he has a prima facie case is that there is a causal link between his protected activity and an adverse employment action.

*University of Texas Southwestern Med. Ctr. v. Nassar*, 570 U.S. 338 (2013) holds that a plaintiff making a retaliation claim under § 2000e-3(a) must establish that his or her protected activity was a "but-for" cause of the alleged adverse action by the employer, not merely a motivating factor.  The Supreme Court distinguished Title VII retaliation claims from Title VII status-based discrimination claims, where it suffices to show that the motive to discriminate was one of the employer's motives even if the employer also had other, lawful motives.[21]

_____

[21]Plaintiff's reliance upon *Guigg v. Thomas Cnty. Sch. Dist.*, 814 F.3d 1227 (11th Cir. 2016), is misplaced, as the mixed-motive discussion therein related to a status-based

Plaintiff's allegations and admissions throughout the record before the Court that the adverse employment actions he alleges to have been subjected to were, at least in part, based upon his attendance at the School Board meeting, precludes him from being able to prove that "but for" his protected activities, he would not have been subjected to such actions.  As noted above, his attendance at the School Board meeting was not a protected activity under Title VII.

Plaintiff has, therefore, failed to establish a prima facie case on the causation element. Accordingly, the Court concludes, as a matter of law, that Plaintiff cannot prevail on his Title VII retaliation claim.  Therefore, summary judgment is granted to Defendants as to this Count.

### COUNT VIII

In his responding papers, Plaintiff concedes that he is not entitled to any relief under his due process claims. [DE 70 at 16].  Summary Judgment is granted as to Count VIII.

### COUNT IX

In his responding papers, Plaintiff concedes that he is not entitled to any relief under his due process claims. [DE 70 at 16].  Summary Judgment is granted as to Count IX.

### COUNT X

Count X alleges that the School District is liable for the unlawful and unconstitutional actions and damages against Plaintiff by the individual Defendants.  This Count is entitled

---

discrimination claim.

"Respondeat Superior of the District." [DE 1 at 21]. The legal basis for this Count is unclear from the Complaint.  As noted *supra*, the School District's liability cannot be based upon the doctrine of *respondeat superior* in a 42 U.S.C. §1983 case; therefore, summary judgment is granted as to any such claim.  To the extent Plaintiff intends this Count to relate to his Title VII claims, this Count is redundant and unnecessary, as Plaintiff alleges Title VII claims in Counts VI and VII.

Inasmuch as this Count fails to state a claim as a matter of law, Summary Judgment is granted as to this Count.

Accordingly, it is hereby **ORDERED AND ADJUDGED** that Defendants' Motion for Summary Judgment [**DE 65**] is **GRANTED**.  In accordance with Fed. R. Civ. P. 58, final judgment will be entered  by separate order.

**DONE AND ORDERED** in Chambers, at West Palm Beach, Palm Beach County, Florida, on this 21st day of March, 2019.

KENNETH A. MARRA
United States District Judge